*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *SONJA FALK,* | ) | |
| | ) | |
| *Petitioner* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 09-346-P-S* |
| | ) | |
| *JON ALAN SINCLAIR,* | ) | |
| | ) | |
| *Respondent* | ) | |

*RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW*

On August 4, 2009, the petitioner, a German citizen who resides in Germany, filed a petition pursuant to the Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 *et seq.*, for the return of her child, J.J.F., to Germany following the child's alleged wrongful retention by her father, a U.S. citizen who resides in Maine. *See* Verified Petition for Return of Child to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent ("Petition") (Docket No. 1). J.J.F. is now eight years old. *See id.* ¶ 5 & Exh. C thereto.

On September 8, 2009, following the issuance of an August 17, 2009, order to the petitioner to show cause why the Petition should not be granted, I held a show-cause hearing at which the petitioner's counsel, as well as the respondent and his counsel, appeared. *See* Docket Nos. 12, 16. The petitioner offered into evidence, and I admitted without objection, her verified Petition and six attachments thereto, Exhibits A through F. *See* Docket No. 17. At my direction, the respondent delivered J.J.F.'s passport to the custody of the Clerk's Office the following day. *See* Docket Nos. 18-19.

1

Following several postponements to accommodate the petitioner's counsel's diligent and ultimately successful attempts to secure their client's physical presence at hearing, *see* Docket Nos. 23, 27, 31, a continued evidentiary hearing was held before me on December 1, 2009, at which nine witnesses, including the petitioner and the respondent, testified, *see* Docket Nos. 56, 58.  In addition, I took J.J.F.'s testimony *in camera*, and I admitted one additional exhibit offered by the petitioner and nine exhibits offered by the respondent.[1]  *See* Docket No. 57.  The respondent offered a 10th exhibit solely as an illustrative aid, which I admitted for that limited purpose.  *See id.*  The testimony of the petitioner and her mother, Lieselotte Falk, was taken with the assistance of two German interpreters supplied by the petitioner.[2]

In conducting the continued evidentiary hearing, I had the benefit of pre-hearing memoranda and proposed exhibit and witness lists filed by both parties at my direction.  *See* Docket Nos. 28-29, 43, 49.  Both sides also filed motions *in limine* to exclude certain evidence, *see* Docket Nos. 41-42, with respect to which I issued a ruling on November 25, 2009, *see* Docket No. 52.  At the conclusion of the continued evidentiary hearing, counsel for both parties briefly argued orally.  At my direction, on December 16, 2009, both parties filed proposed findings of fact and conclusions of law.  *See* Petitioner's Proposed Findings of Fact and Conclusions of Law ("Petitioner's Post-Hearing Brief") (Docket No. 63); Respondent's

---

[1] At my direction, on November 12, 2009, the parties filed simultaneous briefs addressing whether I should take testimony from J.J.F. and, if so, in what manner.  *See* Docket Nos. 36-37.  The petitioner opposed the taking of the testimony, and the respondent favored it.  *See id.*  By order dated November 23, 2009, I ruled that I would take the testimony *de bene esse.  See* Docket No. 48.  I proposed to do so *in camera* in the presence of only two individuals, my law clerk and the court reporter.  *See id.*  I directed the parties to file with the court, no later than noon on Monday, November 30, 2009, proposed questions to be asked of J.J.F., as well as any comment on the manner in which I proposed to take the testimony.  *See id.*  The parties duly filed proposed questions.  *See* Docket Nos. 53-54.  While the petitioner continued to object to the taking of J.J.F.'s testimony, neither side objected to the manner in which I proposed to take it.  *See id.*

[2] Prior to the continued evidentiary hearing, I had ascertained, and reported to counsel, that in Hague Convention cases the court can neither provide interpreters free of charge nor pay for them.  *See* Docket No. 31.

Proposed Findings of Fact and Conclusions of Law ("Respondent's Post-Hearing Brief") (Docket No. 64).

With the benefit of the evidence taken on September 8 and December 1, 2009, and able counsel's briefs and argument, I now recommend that the court adopt the following proposed findings of fact and conclusions of law, grant the Petition, and order J.J.F. forthwith returned to Germany.

## I.  Proposed Findings of Fact

1.      J.J.F. was born in Düsseldorf, Germany, in July 2001.  *See* Exh. C to Petition. Her biological parents are the petitioner and the respondent.  Her father, an American citizen, was living and working in Germany when he met her mother, a German citizen.  The petitioner and the respondent never married.  J.J.F. is a German citizen and carries a German passport.

2.      When J.J.F. was five months old, the respondent moved in with the petitioner and J.J.F., and all three lived together in Germany.  J.J.F. learned to speak German with no difficulty.

3.      In the summer of 2004, the petitioner, the respondent, and J.J.F. visited the respondent's parents in Maine for approximately 10 days.  The respondent's mother, Rosemarie Grant, spoke to the petitioner and the respondent about the possibility of providing them a family cottage, were they to move to the United States.  In the fall of 2004, the respondent and the petitioner decided that they would accept Grant's offer.  Their decision was relayed to Grant, who gave notice in January 2005 to the tenants then residing in the cottage that they would have to vacate it to accommodate her son and his family.

4.      In December 2004, J.J.F. commenced German preschool.  In the summer of 2005, the respondent traveled to the United States to begin renovating the cottage.  He also secured work in Maine installing floors.

5.      In November 2005, the petitioner and J.J.F. joined the respondent in Maine.  For the first four or five weeks after their arrival, they lived with the respondent's parents while the respondent continued renovating the cottage.  The petitioner, the respondent, and J.J.F. then moved into the cottage, which the petitioner helped to decorate for Christmas.  The petitioner arranged for the transport of her two cats from Germany to Maine at a cost of $600.  Grant picked them up at Logan Airport in Boston.

6.      The petitioner flew back to Germany with J.J.F. in March 2006, evidently because of the expiration of her temporary visa waiver.  She and J.J.F. returned to Maine in May 2006.  At that time, the petitioner intended to obtain work in Maine, seek U.S. citizenship, and remain in the United States on a permanent basis.

7.      While the petitioner and J.J.F. were living in Germany from March to May 2006, J.J.F. again attended preschool there.  In September 2006, the petitioner and the respondent enrolled J.J.F. in kindergarten at the Village Elementary School in York, Maine.  *See* Respondent's Exh. 5.

8.      J.J.F. made friends in Maine and enjoyed socializing with her cousins, her paternal grandparents, and other family members.  She liked school and her kindergarten teacher, Carolyn Dupre.  She is intelligent and learned English so quickly and well that Dupre did not realize that she was not an American girl.

9.      Initially in kindergarten, J.J.F. had some difficulty with phonemic awareness for which she received extra academic support, and some difficulty socializing.  However, she was adjusting and making progress on both fronts.

10.      The petitioner spent considerable amounts of time with the respondent's family, talking, playing card games and dice, and having meals with them.  She developed a particularly

close relationship with Grant, the respondent's mother.  She planted gardens at the cottage.  In November 2006, the Grants took the petitioner and the respondent out to dinner to celebrate the anniversary of their first year in Maine.  Members of the petitioner's family visited her in Maine during Christmas 2006 and stayed through the New Year's holiday.

11.     Nonetheless, the petitioner's relationship with the respondent deteriorated, and she became noticeably unhappy living in the United States.  No later than January 2007, she informed the respondent that she wished to return to Germany.

12.     The respondent did not object to the petitioner's immediate return to Germany.  However, he did object to J.J.F.'s return in the middle of the school year.  Ultimately, however, he agreed to permit J.J.F. to return to Germany with her mother.  Without aid of counsel, he drafted a custody agreement based on a model that he had obtained from the internet.  On February 20, 2007, he and the petitioner executed the agreement, which was notarized.  The agreement provided, in its entirety:

> Considering the best interests of [J.J.F.], we agree to rest her physical and residential care with Sonja Falk with paternal access and parental rights in Jon Alan Sinclair as specified in this document.
>
> 1.     To provide for continuity during the school year, since Sonja Falk intends to be living in Dusseldorf N.R.W. Germany, the residence of [J.J.F.] shall be with Sonja Falk from one week before the beginning of school until one week after school has ended.  Sonja Falk will have the primary day-to-day responsibility for the guidance and upbringing of [J.J.F.] during the school year.
>
> 2.     The residence of [J.J.F.] shall be with Jon Sinclair during the summer months from one week after school is out until one week before school begins.  Jon Sinclair shall have the primary day-to-day responsibility for the guidance and upbringing of [J.J.F.] during that period.
>
> 3.     During the time that [J.J.F.] resides with one parent the other parent shall have the possibility to visit [J.J.F.].  [J.J.F.] shall celebrate Christmas every other year with each parent.

4. We agree to consult each other frequently by telephone, in person or by correspondence to mutually agree to the general health and welfare, education and development of [J.J.F.]. Both of us shall have access to medical and school records. The parent having physical custody of [J.J.F.] shall take the child to any medical or dental appointments.

5. From September through May of each year, Jon Sinclair agrees to pay Sonja Falk what the German State requires. From June through August Jon Sinclair will not pay this amount because [J.J.F.] shall be with him. There shall be no further child support owed by either party to the other.

6. We agree to review the support needs of [J.J.F.] annually. If adjustments need to be made due to [J.J.F.'s] needs or increased resources, we will attempt to agree on the increased amount.

7. Sonja Falk agrees to keep in effect the family health insurance policy provided in Germany.

8. In the event of the death of Jon Sinclair or Sonja Falk; [J.J.F.] shall reside with the remaining parent. We feel it is important for [J.J.F.] to know both families, the parties agree that [J.J.F.] may visit the family each year. The family will also be responsible for the arrangements and cost of transportation.

9. This agreement reflects our current feelings with respect to the best interests of [J.J.F.]. We feel that if any of the following events should occur, either of us may ask to reconsider the existing custody arrangement:
   a. One parent wishing to move;
   b. Serious problems affecting the physical or emotional health of either of the parents or [J.J.F.];
   c. Marriage or cohabitation;
   d. A change in [J.J.F.'s] needs or wants in the future regarding her residence.

Agreement for Shared Custody ("Custody Agreement"), Exh. B to Petition.

13. On February 5, 2007, without advance notice to the school, J.J.F. ceased attending kindergarten. The petitioner moved back to Germany with J.J.F. in March 2007. She left her cats in Maine because the respondent had offered to keep them and she could not afford to transport them back to Germany. From March to June 2007, the petitioner and J.J.F. lived with the petitioner's mother. J.J.F. did not attend school during that time. According to the respondent, the petitioner had promised him that she would enroll J.J.F. in school immediately.

6

According to the petitioner, no such promise was made, and German schools were not taking kindergarten enrollment during that time frame.

14.    In June 2007, the respondent flew to Germany to accompany J.J.F. back to the United States for her summer visit.  In August 2007, the respondent accompanied J.J.F. back to Germany, and both he and the petitioner enrolled her in first grade there.

15.    Between June 2007 and October 2007, the petitioner lived with her sister and then with a close friend.  J.J.F. joined her mother upon her return in August 2007.  On October 1, 2007, the petitioner moved into her own apartment with J.J.F., which the petitioner's mother described at hearing as a beautiful apartment.  The petitioner has lived there since.

16.    When J.J.F. returned with her mother to Germany in March 2007, she missed her father.  However, she made friends in Germany and frequently visited her German relatives, including her maternal grandmother, aunts and uncles, and cousins.

17.    Upon starting first grade in Germany, J.J.F. ran into difficulties at school.  At first, the petitioner helped J.J.F. with her homework.  However, J.J.F.'s teacher, Frau Prescher, instructed the petitioner, per her policy regarding all first graders, not to help J.J.F. and to limit her homework time to only 20 minutes a day, regardless of whether J.J.F. completed it or did it correctly.  The petitioner complied.  J.J.F. also had problems with a boy who bullied her at school, concerning which the petitioner met with school officials on a couple of occasions.  J.J.F. sometimes told her mother that she wanted to return to school in the United States.  The petitioner brought J.J.F. to a school psychologist, after which the petitioner perceived that things improved.  Nonetheless, at the end of the school year, the school recommended to the petitioner that J.J.F. repeat first grade.

18.     On June 28, 2008, J.J.F. flew as an unaccompanied minor from Germany to the United States to reside with her father for the summer in York, Maine.  *See* Petition ¶ 4; Respondent's Exh. 8.  Her travel itinerary, as arranged by the Village Travel Center, Inc. of York, Maine, called for her to depart Boston on Lufthansa Flight 423 on August 5, 2008, arriving in Frankfurt, Germany, on August 6, 2008, and to depart Frankfurt that day on Lufthansa Flight 800 bound for Düsseldorf.  *See* Respondent's Exh. 8.  The petitioner was aware of these arrangements.  *See* Respondent's Exh. 9.

19.     The day before J.J.F. departed for the United States, she had a fight with her mother over J.J.F.'s refusal to brush her teeth.  J.J.F. had sustained a minor mouth injury, and her doctor had instructed her to brush her teeth especially well before applying a prescribed salve. The petitioner described this as a "big fight," with "some yelling."

20.     The respondent and his mother, Rosemarie Grant, met J.J.F.'s plane in Boston on June 28, 2008.  On the drive back to Maine, J.J.F. told her father and grandmother that she had failed first grade, was going to have to repeat it, and had had no help at school.  She complained that her teacher was mean to her and that other children picked on her.  She stated that she did not want to go back to school in Germany.

21.     This information came as a surprise to the respondent.  He was upset not only that J.J.F. had encountered such difficulties but also that, in what he viewed as a breach of the parties' agreement, the petitioner had failed to apprise him of them.  He asked J.J.F. what she wanted to do.  J.J.F. responded that she wished to stay in Maine.  The respondent agreed with this course of action.  He reasoned that, whereas J.J.F. expressed hatred of school in Germany, she had been happy and had thrived in school in Maine.

22.     Upon his arrival home with J.J.F., the respondent phoned the petitioner and informed her that, in his view, she had failed to live up to their agreement and that he would not return J.J.F. to Germany.  The petitioner strongly objected, stating that she and the respondent had an agreement and that he was obligated to return J.J.F.  In ensuing phone conversations over the course of the summer, the respondent continued to state that he would not return J.J.F., and the petitioner continued to insist that he return her.

23.     On June 28, 2008, the petitioner also spoke with J.J.F., who asked if she could stay with her father.  The petitioner has continued to speak with her daughter by telephone regularly.  Initially, she told her daughter that it was wrong for her father to keep her Maine and that she had to come home to Germany.  Over time, she ceased bringing the subject up because she realized it caused her daughter pain.

24.     In July 2008, the petitioner consulted German attorney Brigitte Lasota concerning her options if the respondent failed to return J.J.F. at the appointed time.  *See* Respondent's Exh. 12.  Lasota recommended that the petitioner wait to see whether J.J.F. returned as planned on August 6, 2008.  *See id.*

25.     On August 4, 2008, the respondent called the petitioner and told her not to go meet their daughter's plane because J.J.F. would not be on it.  The petitioner reiterated that they had an agreement, that he had a duty to send J.J.F. back, and that he would have to do so.  The respondent again stated that he would not send her back.

26.     The petitioner testified that she expected her daughter to be on the plane from Frankfort on August 6, 2008.  She went to the airport to meet J.J.F.'s flight that day.  Her daughter was not on the plane.

27.     The following day, the petitioner returned to Lasota's office, where she completed a request for return of J.J.F dated August 7, 2008.  *See id.*; *see also* Exh. D to Petition.  The request was sent to the German Central Authority in Bonn, Germany, the following day.  *See id.*[3] It stated, *inter alia*:

> During the holiday the father said to the mother, that he thinks that it's better the daughter stay [with] him forever.  The mother contradicted and said that the daughter has to return at 06.08.2008, according to the agreement.  The mother didn't believe that the father will not return the daughter till 06.08.2008 and await[ed] [the] time.
>
> However [J.J.F.] didn't return at 06.08.2008 with the announced flight.  At the 10.08.2008 the mother was able to make telephone call with [J.J.F.] and [J.J.F.] said, that she wants to come home and that her mother make a conversation [with] the father, because she hasn't the h[e]art to do it.

*Id*.

28.     By cover letter dated August 25, 2008, the German Central Authority forwarded a copy of the request for return of J.J.F. to the United States Central Authority, the Department of State.  *See id*.

29.     The respondent enrolled J.J.F. in first grade at the Village Elementary School in York in August 2008.  *See* Respondent's Exh. 6.  Testing scores indicated that J.J.F. was far behind her peers, and she was placed in a reading recovery program for 20 weeks.  *See id*. During that period, she gained 22 levels in reading recovery, and her reading scores advanced from below average to above average.  *See id*.  She was described as very enthusiastic about reading and writing and very consistent with her reading at home.  *See id*.  She displayed strong math skills.  *See id*.  She was shy at first but then made friends and went on play dates.

---

[3] Article 6 of the Hague Convention requires every "Contracting State [to] designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities."  Hague Convention art. 6.

30.     By letter dated October 7, 2008, the United States Central Authority wrote to the respondent to apprise him of the petitioner's request for return of J.J.F. and to ask him to consider voluntarily returning her to Germany.  *See* Respondent's Exh. 3.  The United States Central Authority noted that, if J.J.F. were not voluntarily returned, the petitioner could initiate legal proceedings under the Hague Convention.  *See id.*

31.     Later that month, the respondent e-mailed the United States Central Authority, maintaining that his retention of J.J.F. was consistent with the Custody Agreement, J.J.F.'s wishes, and her best interests, and transmitting a proposed revised custody agreement essentially reversing the periods of custody in the existing agreement by granting him primary custody of J.J.F. during the school year and the petitioner primary custody during summers.  *See* Respondent's Exhs. 2, 4.  A representative of the United States Central Authority e-mailed him on October 20, 2008, stating that his response would be forwarded to the German Central Authority.  *See* Respondent's Exh. 4.

32.     The petitioner never saw a copy of the respondent's proposed revised custody agreement.

33.     The respondent heard nothing back concerning his proposed resolution of the parties' disagreement until the petitioner filed the instant suit on August 4, 2009.

34.     After October 2008, the respondent had few conversations with the petitioner.  He did not want to speak with her if things could not be worked out in what he considered to be a productive manner.  The parties did discuss the possibility of sending J.J.F. to Germany during Christmas 2008 or the summer of 2009.  The respondent expressed willingness to do so but stated that he did not have the money to send her.  According to the petitioner, he promised to send her in July 2009 but failed to do so.

35.     The respondent testified that he viewed the parties' discussions regarding sending J.J.F. to Germany as signs that they were working out their disagreement.  As a result, he testified, he was surprised when she filed the instant suit.  However, he acknowledged that the petitioner never told him that he could retain J.J.F. in the United States, apart from summers and every other Christmas.  The petitioner's mother also testified that she never heard her daughter say that it was fine with her for the respondent to retain J.J.F. in the United States.

36.     J.J.F. is now in second grade at the Coastal Ridge Elementary School in York, Maine.  Her father remarried, and she lives with her father, stepmother, a stepbrother, stepsister, and a half-brother who was born on her birthday in 2008.

37.     When I interviewed J.J.F. *in camera*, I found her to be bright, articulate, and mature for her age.  She seemed comfortable and relaxed with me, even displaying a charming sense of humor.  She understood that these proceedings concerned the question of whether to send her back to Germany.  As is completely understandable for a child of two loving parents, particularly one so young, she conveyed a strong desire to see and be with both and a decided reluctance to, in effect, choose between them.  While she did strongly object to returning *to her school* in Germany and expressed a preference to speak English rather than German and to remain in Maine, she did *not* object to returning to Germany.

## II.  Proposed Conclusions of Law

### A.  Jurisdiction

1.     The court has jurisdiction over this matter pursuant to the Hague Convention and ICARA, 42 U.S.C. § 11603.  The Hague Convention applies "to any child who was habitually resident in a Contracting State immediately before any breach of custody or access rights."  Hague Convention art. 4.  It "cease[s] to apply when the child attains the age of 16 years."  *Id.*

12

Both the United States and Germany are Contracting States.  *See, e.g., Koch v. Koch*, 450 F.3d 703, 711 (7th Cir. 2006).  J.J.F. is less than 16 years old.  ICARA vests the United States district courts and the state courts with concurrent original jurisdiction of actions arising under the Hague Convention.  *See* 42 U.S.C. § 11603(a).  A petition may be filed "in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed."  *Id.* § 11603(b).  At the time the Petition was filed J.J.F. was, and she continues to be, located within the jurisdiction of this court.

### B.  Elements of Parties' Claims, Defenses

2.      "The two main goals of the Hague Convention are to secure the prompt return of children wrongfully removed to or retained in any Contracting State, and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting State."  *Yang v. Tsui*, 499 F.3d 259, 270 (3d Cir. 2007) (citation, footnote, and internal quotation marks omitted).  "It is well settled that the Convention was not designed to resolve international custody disputes."  *Id.*  "Rather, the Convention was designed to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases."  *Id.* (citation and internal quotation marks omitted).

3.      A petitioner bears the burden of showing by a preponderance of the evidence that a child has been wrongfully retained within the meaning of the Hague Convention.  *See, e.g.*, 42 U.S.C. § 11603(e)(1)(A).

4.      Under Article 3 of the Hague Convention, the removal or retention of a child is wrongful when "it is in breach of rights of custody attributed to a person, . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before

the removal or retention" and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Hague Convention art. 3. "Very little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised." *Yang*, 499 F.3d at 277 (citation and internal punctuation omitted). "The petitioner can show the exercise of custody rights by demonstrating that he or she kept or sought to keep, some sort of regular contact with the child." *Id*. "Essentially, nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights." *Id*.

5.      In addition, "a petitioner cannot claim that the removal or retention of a child is 'wrongful' under the Hague Convention unless the child to whom the petition relates is 'habitually resident' in a State signatory to the Convention and has been removed to or retained in a different state." *Id*. at 270 (citation and internal punctuation omitted) (emphasis omitted). "[T]he text of the Convention directs courts to only one point in time in determining habitual residence: the point in time 'immediately before the removal or retention.'" *Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) (quoting Hague Convention art. 3); *see also, e.g., Simcox v. Simcox*, 511 F.3d 594, 602 (6th Cir. 2007) ("On its face, habitual residence pertains to customary residence prior to the removal.  The court must look back in time, not forward.") (citation and internal quotation marks omitted).

6.      "The Convention establishes a strong presumption favoring return of a wrongfully removed child." *Danaipour v. McLarey*, 286 F.3d 1, 13 (1st Cir. 2002). "Children who are wrongfully removed or retained within the meaning of the Hague Convention are to be returned promptly unless one of the narrow exceptions applies." *Kufner v. Kufner*, 519 F.3d 33, 38 (1st Cir. 2008).

14

7.      The respondent contests that the petitioner has met her burden to prove that J.J.F. was habitually resident in Germany. *See* Respondent's Post-Hearing Brief at 19. Alternatively, in the event the petitioner is deemed to have met that burden, he invokes three of the Hague Convention's narrow exceptions: (i) the affirmative defense under Article 12 of the Hague Convention that the petition was untimely filed and the child has become well-settled (the "well-settled" affirmative defense), (ii) the affirmative defense under Article 13 of the Hague Convention that the child objects to being returned to Germany and is sufficiently mature that it is appropriate to take those views into account (the "child's objection" affirmative defense), and (iii) the affirmative defense under Article 13(a) of the Hague Convention that the petitioner acquiesced in the child's removal (the "acquiescence" affirmative defense). *See id.*

8.      At the close of the evidentiary hearing held on December 1, 2009, the respondent withdrew a fourth defense, the "grave risk" affirmative defense under Article 13(b) of the Hague Convention, conceding that he had failed to prove by the requisite clear and convincing evidence that J.J.F. faced a grave risk of psychological harm if returned to Germany. *See, e.g., id.* at 3. However, he argued that it was appropriate for the court to take risk of harm into account in considering his "well-settled" and "child's objection" affirmative defenses. *See id.*

9.      To succeed on a "well-settled" affirmative defense, a respondent must prove by a preponderance of the evidence that the Hague Convention proceeding was commenced more than one year after the child's wrongful removal and that the child has become well-settled in his or her new environment. *See, e.g.*, Hague Convention art. 12; 42 U.S.C. § 11603(e)(2)(B).

10.     To succeed on an "acquiescence" affirmative defense, a respondent must prove by a preponderance of the evidence that the petitioner consented to, or subsequently acquiesced in, the removal or retention. *See, e.g.*, Hague Convention art. 13(a); 42 U.S.C. § 11603(e)(2)(B);

15

*Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996) ("subsequent acquiescence" requires "either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time") (footnotes omitted).

11.     To succeed on a "child's objection" affirmative defense, a respondent must prove by a preponderance of the evidence "that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention art. 13; 42 U.S.C. § 11603(e)(2)(B).  "The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis."  *Yang*, 499 F.3d at 279.

12.     "These affirmative defenses are narrowly construed to effectuate the purposes of the Convention, and even where a defense applies, the court has the discretion to order the child's return."  *Id.* at 271 (citation and internal quotation marks omitted).

### C.  Petitioner's Showing of Wrongful Retention

13.     The petitioner meets her threshold burden of demonstrating that the respondent's retention of J.J.F. was wrongful.  This is so because:

A.     As the respondent acknowledged at hearing, the petitioner demonstrates that she had, at a minimum, shared custody of J.J.F. and that, at all relevant times, she either exercised custody rights over J.J.F. or would have done so but for the respondent's retention of J.J.F. in Maine.  *See, e.g.*, Exhs. B, E to Petition.

B.     Although the respondent disputes that, on the totality of the evidence introduced by both sides, the petitioner has met her burden to show that J.J.F. was habitually resident in

16

Germany immediately before the alleged retention, I conclude, for the reasons that follow, that this burden is met.

14.     In a leading case on the question of habitual residence, the United States Court of Appeals for the Ninth Circuit observed:

> While the decision to alter a child's habitual residence depends on the settled intention of the parents, they cannot accomplish this transformation by wishful thinking alone.  First, it requires an actual change in geography.  Second, home isn't built in a day.  It requires the passage of an appreciable period of time, one that is sufficient for acclimatization.  When the child moves to a new country accompanied by both parents, who take steps to set up a regular household together, the period need not be long.  On the other hand, when circumstances are such as to hinder acclimatization, even a lengthy period spent in this manner may not suffice.

*Mozes v. Mozes*, 239 F.3d 1067, 1078 (9th Cir. 2001) (citations, footnotes, and internal punctuation omitted).  In the wake of *Mozes*, most circuit courts of appeals have "focused on the parents' last shared intent in determining habitual residence."  *Koch*, 450 F.3d at 715; *see also, e.g., Gitter v. Gitter*, 396 F.3d 124, 131 (2d Cir. 2005) ("The primary insight of *Mozes* is its recognition of the importance of intentions (normally the shared intentions of the parents or others entitled to fix the child's residence) in determining a child's habitual residence.").

15.     "Once courts have resolved where the parents mutually intended the child's habitual residence to be, they have generally concluded that the child's habitual residence, in fact, accords with that parental intent."  *Id.* at 133.  Courts must also consider whether a change in shared parental intent is accompanied by a change in geography, and "whether, notwithstanding the intent of those entitled to fix the child's habitual residence, the evidence points unequivocally to the conclusion that the child has become acclimatized to his new surroundings and that his habitual residence has consequently shifted."  *Id.*

16.    "As *Mozes* cautions, however, courts should be slow to infer that the child's acclimatization trumps the parents' shared intent."  *Id*. at 134 (citation and internal quotation marks omitted).  "The object of the Convention is to dissuade parents and guardians from engaging in gamesmanship with a child's upbringing in order to secure an advantage in an anticipated custody battle."  *Id*.  "Permitting evidence of acclimatization to trump evidence of earlier parental agreement could open children to harmful manipulation when one parent seeks to foster residential attachments during what was intended to be a temporary visit."  *Id*. (citation and internal quotation marks omitted).[4]

17.    The respondent places great weight on the parties' decision to relocate to Maine in November 2005 and to make it their permanent home, even going so far as to fly the petitioner's two cats from Germany to the United States.  *See, e.g.*, Respondent's Post-Hearing Brief at 4-5.  Yet, no later than February 20, 2007, that shared intention had radically changed with the breakup of the parties' romantic relationship.  As of then, as reflected in their signed, notarized Custody Agreement, the parties agreed that the petitioner would move back to Germany, the respondent would remain in the United States, and the petitioner would have primary custody of J.J.F. in Germany.  That was their final *shared* settled intent.[5]

---

[4] In a *per curiam* decision predating *Mozes*, the First Circuit quoted a passage from *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995), defining a child's habitual residence as "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective.  A determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there."  *Zuker v. Andrews*, No. 98-1622, 1999 WL 525936, at *1 (1st Cir. Apr. 9, 1999) (internal punctuation omitted).  Although, inasmuch as appears, the First Circuit has not had occasion to decide whether to adopt the analytical construct set forth in *Mozes*, I perceive no clash between *Mozes*' approach and that set forth in the quoted passage from *Feder*.  *Mozes*, like *Feder*, focuses on whether "a *child* has abandoned a prior habitual residence" but recognizes the reality that "[c]hildren . . . normally lack the material and psychological wherewithal to decide where they will reside[,]" as a result of which the parents' shared settled intent respecting a child plays a prominent role in analysis.  *Mozes*, 239 F.3d at 1077 (emphasis in original).

[5] It is clear that, in the period between June 28, 2008, when the respondent told the petitioner that he would not return J.J.F., and August 5, 2008, when he was to have placed her on a flight to Germany, the parties arrived at no new shared settled intent as to her primary residence.  Nor have they reached accord on that subject to this day. *(continued on next page)*

18

18.     That final shared intent was accompanied by the requisite change in geography. The petitioner took J.J.F. with her when she returned to Germany in March 2007.  Bearing *Mozes*' admonitions in mind, I find no reason to infer that consideration of J.J.F.'s acclimatization as of the relevant point in time, August 5, 2008, trumps the parties' clear, final shared settled intent.

19.     J.J.F. was born in Germany to a German mother, lived there until she was four years old, learned to speak German fluently, attended preschool in that country, and developed relationships with her maternal grandmother and other relatives there.  She is a German citizen and has a German passport.  Although she moved to Maine with her mother in November 2005, she returned to Germany with her for the period between March and May 2006.  While, in the period before March 2007, she was acclimatizing well to the United States, speaking English fluently, enjoying her family in Maine, beginning to make friends, and beginning to thrive in American kindergarten after a difficult start, she returned with her mother to Germany and primarily resided there in accordance with the Custody Agreement until her father refused to place her on her return flight to Germany on August 5, 2008.

20.     J.J.F. was enrolled by both of her parents in first grade in Germany in the fall of 2007 and attended school regularly.  She made friends and was in regular contact with relatives, including her maternal grandmother.  Her unhappiness and difficulty at school in Germany, her communication, commencing on June 28, 2008, of a desire to remain in the United States, and the ease with which she adjusted to living in the United States in the summer of 2008 do not undermine a finding that she was habitually resident in Germany as of August 5, 2008.  *See, e.g., AGO v. Odu*, No. 8:09-cv-976-T-17TBM, 2009 WL 2169857, at *10 (M.D. Fla. July 20, 2009)

---

Although the Custody Agreement provided that either party could ask to revisit its provisions in light of changes in J.J.F.'s needs and wants, it did not provide that either could unilaterally amend it.

(while 14-year-old child reacclimated quickly to the United States during summer visit to respondent's home and expressed desire to remain there, those "positive contacts" alone were insufficient to show change in habitual residence in view of parents' last shared settled intention that he live in the United States only during summers).

21.     In addition, the amount of time during which J.J.F. lived primarily in Germany prior to August 5, 2008, is consistent with a finding of acclimatization for a child of her age. *See, e.g., Lockhart v. Smith*, No. 06-cv-160-P-S, 2006 WL 3091295, at *2-*3 (D. Me. Oct. 20, 2006) (although parents did not have shared intent about where six- and seven-year-old children should reside after July 2005, children became habitual residents of Nova Scotia, where they had lived for one year as of time of wrongful retention in July 2006, "a substantial period of time given their age").

### D.  "Well-Settled" Affirmative Defense

22.     The respondent has not proved, by a preponderance of the evidence, that the petitioner filed the instant petition more than one year after the wrongful retention of the child.

23.     The respondent argues that the wrongful retention occurred on June 28, 2008, when he put the petitioner on clear notice that he would not return J.J.F. as scheduled.  *See* Respondent's Post-Hearing Brief at 13.  Alternatively, he argues, if the retention occurred on August 5, 2008, when he failed to place the child on her return flight to Germany, the filing of the instant action on August 4, 2009 still was untimely because made more than one year later according to his calculations.  *See id*. at 13-14.

24.     The petitioner counters that, under controlling First Circuit law, *Toren v. Toren*, 191 F.3d 23 (1st Cir. 1999), the respondent's conveyance of his *intention* not to return the child at the appointed time cannot as a matter of law constitute a "wrongful retention."  *See*

20

Petitioner's Post-Hearing Brief at 4 & n.1, 6.  Under *Toren*, she argues, no wrongful retention could occur until the respondent took action inconsistent with the parties' Custody Agreement – in other words, until August 5, 2008, at the earliest.  *See id*.  She reasons that the filing of the Petition on August 4, 2009, was timely pursuant to Federal Rule of Civil Procedure 6(a)(1), which provides, in calculating time, for exclusion of the day of the event triggering the period. *See id*. at 7.  On that point, the respondent rejoins that (i) Rule 6 conflicts with the Hague Convention, (ii) in such instances, the Hague Convention trumps, and (iii) pursuant to the Hague Convention, the Petition was untimely filed even if one accepts that the retention occurred on August 5, 2008.  *See* Respondent's Post-Hearing Brief at 13-14.

25.     The petitioner has the better argument.  In *Toren*, the parties had entered into a modified separation agreement dated May 20, 1996, approved by the Jerusalem District court, that the children would reside with their mother in Massachusetts for a period of years, but not beyond July 21, 2000.  *See Toren*, 191 F.3d at 25.  On July 6, 1998, well before the time that the agreed period of residence with the mother was to end, the father filed a Hague Convention petition, alleging that the mother's filing of a verified complaint for custody in Massachusetts court evidenced her *intention* to wrongfully retain the couple's two children in the United States. *See id*. at 26-27.  The First Circuit held that no wrongful retention had occurred, not only because the evidence to which the father pointed revealed nothing about the mother's intention to retain the children in Massachusetts after July 21, 2000, but also because:

> Even if the father had alleged facts sufficient to support his claim that the mother intended to retain the children in the United States after July 21, 2000, we do not believe that the Hague Convention or ICARA would enable us to exercise jurisdiction over such a claim.  To the extent that the father's argument is based on the mother's future intent, the father is seeking a judicial remedy for an anticipatory violation of the Hague Convention.  But the Hague Convention only provides a cause of action to petitioners who can establish actual retention.

> Therefore, we do not see how a petitioner like the father, alleging only an anticipatory retention, can invoke the protections of the Hague Convention.

*Id*. at 28 (citation omitted).  Further, in the context of discussing the weakness of the father's evidence revealing the mother's intentions, the court observed that up until July 21, 2000, "the children's mere presence in the United States cannot constitute a retention because it is entirely consistent with the parties' May 20 agreement."  *Id.*

26.     While in this case, unlike in *Toren*, the respondent did communicate a clear intent to retain J.J.F., he communicated what *Toren* terms "an anticipatory retention."  In those circumstances, no "wrongful retention" sufficient to invoke the protections of the Hague Convention occurred until the respondent took action inconsistent with the parties' agreement by retaining J.J.F. on August 5, 2008.[6]

27.     The wisdom of *Toren*'s approach is illustrated by the circumstances of this case.  While the respondent clearly communicated to the petitioner as early as June 28, 2008, that he *intended* not to return J.J.F. at the appointed time, she communicated just as clearly to him that he was obliged to do so.  She credibly testified that she continued to expect the respondent to place J.J.F. on her scheduled Lufthansa flight, as she insisted he do in accordance with the

---

[6] In *Philippopoulos v. Philippopoulou*, 461 F. Supp.2d 1321 (N.D. Ga. 2006), the United States District Court for the Northern District of Georgia reached the same result by analogy to the doctrine of anticipatory breach of a contract.  The court fixed the date of wrongful retention as August 15, 2005, the date on which the respondent had agreed to return the parties' child to Greece, rather than July 4, 2005, the date on which the petitioner had been served with an Extra-Judiciary Protest and Notice formally notifying him that the respondent intended to remain with the child in the United States.  *See Philippopoulos*, 461 F. Supp.2d at 1323-24.  The court reasoned that communication of an intention to retain a child beyond an agreed fixed date of return "is somewhat analogous to the doctrine of anticipatory breach in contract cases.  If one party to a contract anticipatorily repudiates the contract, the other party may bring an immediate action for a total breach or may wait to sue until after the repudiating party actually fails to perform as agreed.  Although the non-breaching party can bring suit immediately upon the other party's anticipatory repudiation, the statute of limitations does not begin to run until the breach actually occurs (provided the non-breaching party does not place the repudiator in breach, but instead opts to await performance)."  *Id*. at 1324 (citations omitted).  The court observed: "While Petitioner probably could have filed suit immediately upon learning of Respondent's intention to wrongfully retain the child, Petitioner also had the right to wait to file suit until after the retention became wrongful.  Because Respondent had agreed to return the parties' child to Greece on August 15, 2005, her retention of the child did not become wrongful until that date."  *Id*.

Custody Agreement.  Indeed, she went to the airport to meet her daughter.  Only when she satisfied herself that J.J.F. was not among those disembarking from the plane could she be certain that the respondent had in fact retained her daughter beyond the agreed period.  Fixing June 28, 2008, as the date on which the one-year clock began to run is, in these circumstances, illogical and unfair.

28.     The respondent cites two cases for the proposition that a wrongful retention commences as of the date of a clear communication to a petitioner of a respondent's intention to retain a child, as he posits occurred in this case on June 28, 2008.  *See* Respondent's Post-Hearing Brief at 12-13 (citing *Zuker v. Andrews*, 2 F. Supp.2d 134 (D. Mass. 1998), *aff'd*, 181 F.3d 81 (1st Cir. 1999); *Slagenweit v. Slagenweit*, 841 F. Supp. 264 (N.D. Iowa 1993), *vacated as moot*, 43 F.3d 1476 (8th Cir. 1994)).  However, both are factually distinguishable from, and reconcilable with, *Toren*.

29.     In *Zuker*, the parents had agreed that the mother could travel with their child from Argentina to her homeland, the United States, but they had never agreed on the length of stay. *See Zuker*, 2 F. Supp.2d at 138.  The father expected the visit to be short, while the mother expected the child never to return to Argentina.  *See id*. at 138 n.6.  In those amorphous and conflicting circumstances, the court fixed the date of wrongful retention as the date on which the mother, "by moving out of her mother's apartment [in the United States] and renting her own place [there], clearly communicated to [the father] that she was refusing to return to Argentina with [the child]."  *Id*. at 140.  The court observed: "Until that time, [the father] more or less acquiesced in her remaining in Massachusetts."  *Id*.  It reasoned: "Until [the father] knew that [the mother] would not return, it would be unfair to require [the father] to file a petition based on alleged wrongful retention."  *Id*.

23

30. Likewise, in *Slagenweit*, the parents had agreed that the child would reside temporarily with the father in the United States and eventually return to her mother in Germany, but they set no specific date for the child's return. *See Slagenweit*, 841 F. Supp. at 266. The court fixed the date of wrongful retention as the date when the father clearly communicated to the mother his intention to keep the child on a permanent basis (the date urged by the petitioner), rather than the date that the child came to live with the respondent (the date urged by the respondent). *See id*. at 270-71. It reasoned: "[T]here can be no wrongful retention when the child is residing with the parent from whom custody is sought pursuant to an agreement between the parents." *Id*. at 270.

31. For all of the foregoing reasons, I conclude that the wrongful retention in this case occurred on August 5, 2008.[7]

32. The respondent's further argument that the petition is untimely even if the wrongful retention occurred on August 5, 2008, is without merit. While he asserts that there is a conflict between Rule 6 and the Hague Convention, he identifies none. The provision to which he points provides, in relevant part:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

---

[7] This suggested outcome comports with that in *Nicolson v. Pappalardo*, Docket No. 09-cv-541-P-S (D. Me. Dec. 28, 2009). There, this court, citing *Zuker*, fixed the date of wrongful retention as May 4, 2009, the date on which the respondent, a United States citizen, emailed the petitioner, an Australian citizen, to inform him that she would not be returning from the United States to Australia with their child. *See Nicolson*, slip op. at 5, 9 & n.1. In that case, as in *Zuker* and *Slagenweit*, the parties had not arrived at a firm mutual agreement as to the date on which the respondent was to return to Australia with the parties' child after visiting family in the United States. At the time of the respondent's departure from Australia on May 2, 2009, she had not purchased return tickets to Australia for herself and the child, but her feelings regarding the petitioner were in a state of flux. *See id*. at 3-5. While, upon her return to the United States, she at one point placed a return airline ticket, due to depart for Australia on May 22, 2009, on hold with a travel agency, and the petitioner sent money to purchase it, she never bought the ticket. *See id*. at 5. Moreover, in *Pappalardo*, the court was not obliged to determine whether the petitioner had timely filed his petition. Regardless of whether the retention date was fixed at May 4 or May 22, 2009, the petition was clearly timely filed.

> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Hague Convention art. 12. Although this provision indicates that the "well-settled" affirmative defense is available when a petition has been filed "after the expiration of the period of one year[,]" it is silent as to the methodology by which that time period is to be calculated. Hence, there is no conflict in use of the methodology supplied by Rule 6. In turn, calculation of the one-year period in accordance with Rule 6 reveals that the Petition was timely filed before "the expiration of the period of one year[.]"

33. The respondent having failed to prove that the Petition was untimely filed, the "well-settled" affirmative defense is unavailable to him. *See, e.g., Duarte v. Bardales*, 526 F.3d 563, 569 (9th Cir. 2008) ("This one-year filing period is of particular importance under the Convention because the 'well settled' affirmative defense is *only* available if the petition for return was filed more than a year from wrongful removal.") (emphasis in original).

### E. "Acquiescence" Affirmative Defense

34. The respondent has not proved, by a preponderance of the evidence, that the petitioner acquiesced in his retention of J.J.F. in Maine in any manner contrary to the terms of the Custody Agreement. The evidence is to the contrary, falling well short of the standard articulated in *Friedrich* for a finding of acquiescence. Upon being apprised that the respondent intended not to return J.J.F. to Germany on her scheduled flight, the petitioner immediately protested and insisted that J.J.F. be returned. She promptly sought legal assistance and filed a request with the German Central Authority for J.J.F.'s return. She never received a copy of the respondent's proposed revised custody agreement, let alone agreed to it. Her failed negotiations

with him for J.J.F. to fly to Germany at Christmas 2008 or during the summer of 2009 did not signal acquiescence.  The respondent acknowledged during his testimony at hearing that the petitioner never told him that he could retain J.J.F. in the United States, apart from summers and every other Christmas.

### F.  "Child's Objection" Affirmative Defense

35.     It is a close question whether J.J.F. has attained sufficient age and maturity that it is appropriate to take her views into account.  She is a remarkably bright and mature eight-year-old.  Yet, she is only eight.  As one might expect of an eight-year-old fortunate enough to have two loving parents, she has a strong desire to be with both and a great reluctance to choose between them.  In any event, to the extent that it is appropriate to take her views into account, they do not foreclose her return to Germany.  She made clear to me that, despite her strong negative feelings about her German school and a preference to remain in Maine, she does *not* object to being returned to Germany.  Expression of a *preference* to remain in the respondent's country "is not enough . . . to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return."  *Yang*, 499 F.3d at 279 (citation and internal quotation marks omitted); *see also, e.g., Gonzalez Locicero v. Nazor Lurashi*, 321 F. Supp.2d 295, 298 (D.P.R. 2004) ("The fact that the child prefers to remain in Puerto Rico, because he has good grades, has friends and enjoys sport activities and outings, is not enough for this Court to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return.").

36.     Assuming, without deciding, that it is appropriate to take into account risk of harm in this context, the respondent has not established a risk of harm of sufficient magnitude to counsel against return of J.J.F. to Germany.  J.J.F. has made difficult transitions before and has

proved resilient and adaptable.  Inasmuch as appears from the evidence presented, J.J.F.'s difficulties in German first grade stemmed largely from the teaching methodologies of Frau Prescher, as well as bullying by a peer.  There is no evidence that J.J.F. would have the same teacher, a teacher espousing the same methodologies, be subject to bullying by the same child, or even be obliged to attend the same school upon her return to Germany.[8]

### G.  Expenses of Proceeding

37.    Pursuant to Article 26 of the Hague Convention and 42 U.S.C. § 11607(b)(3), a court ordering the return of a child "shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 42 U.S.C. § 11607(b)(3).  Should the court concur with my recommendation that the Petition be granted, I further recommend that it order the petitioner, within a time frame to be specified, to file an itemized bill of said costs and to afford the respondent the opportunity, within a time frame to be specified, to respond with any objections to the petitioner's itemized bill of costs.

### III.  Conclusion

For the foregoing reasons, I recommend that the court ***GRANT*** the Petition and (i) order J.J.F. forthwith returned, at the respondent's expense, to the custody of her mother in Germany, (ii) order the respondent not to remove J.J.F. from the District of Maine pending her return to

---

[8] Nothing in this recommended decision would prevent the parties from reaching private accord as to the best interests, educationally or otherwise, of J.J.F. or from seeking resolution of any remaining custody or best interests disputes by the appropriate German authorities.  The merits of custody disputes are beyond the scope of Hague Convention proceedings.  *See, e.g., Koch*, 450 F.3d at 711 ("An action under the Convention and ICARA is not an action to determine the merits of custody rights.  The court's task is to simply determine which country is the proper forum for that custody determination.") (citations omitted); *see also* Hague Convention art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

Germany, absent prior approval by this court, (iii) order the release of J.J.F.'s passport to the respondent solely for the purpose of travel to Germany, (iv) afford the petitioner an opportunity to file an itemized bill of costs and the respondent an opportunity to file any objections to it, and (v) clarify that nothing in its order prevents the relevant courts in Germany from making an independent determination with respect to the custody of J.J.F.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 31st day of December, 2009.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge